Mr. Littleton. Good morning, Your Honor, and may it please the Court. I'm Matt Littleton, here on behalf of the Administrator of the Environmental Protection Agency. We respectfully seek reversal of the judgment of the District Court. I don't know if we have microphones today or what, but I'm having trouble hearing you as well. Is that better? Yes. Okay. Thanks. Apologize. I'm here on behalf of the Administrator of the Environmental Protection Agency. We respectfully seek reversal of the judgment of the District Court. This case is first and foremost about whether the District Court overstepped the narrow limits that Congress placed on judicial review of EPA inaction under the Clean Air Act. The plaintiffs here sued under Section 304A2 of that act, and they do not dispute that Section 304A2 imposes the same limits of discreteness that the Administrative Procedure Act places as articulated by the Supreme Court in Norton v. Southern Utah Wilderness Alliance. And the question here, thus, is whether Section 321A of the Clean Air Act, which imposes a duty on EPA to, quote, conduct continuing evaluations, unquote, imposes a discreet duty, and the precedent of the Supreme Court in Norton as well as this Court in Village of Bald Head Island answers that question. It does not. It should go further. It's a discreet, nondiscretionary duty, isn't it? That's right, and that's a separate limitation, which, as I can discuss, also imposes the requirement that a date certain deadline be imposed. But the threshold question is whether discreteness is satisfied here, and it's clearly not. As the Supreme Court said in Norton, the APA and the Clean Air Act here do not impose or, excuse me, do not permit courts to review the continuing and thus constantly changing operations of an agency, even when the statute says shall. In Norton, you have the statute saying the agency shall continue to manage particular lands so as to achieve a certain objective, and the plaintiff there said the agency was not doing that, was completely failing to act by failing to manage the lands in that fashion. And the Supreme Court said notwithstanding that you're alleging a complete failure, the question is whether the underlying action that you're challenging is a discreet one, and it's not because it's not a precise, definite action occurring at a particular point in time. It's a continuing action. And Section 321A is a textbook example where it just says shall conduct continuing evaluations. So we think the easiest way for this Court to resolve this case is to follow that precedent in Norton and Village of Bald Head Island and simply say that this is a continuing obligation of the agency that's not enforceable under this provision. Is it enforceable under any statutory regime? So as things currently exist, the question is whether Congress has waived sovereign immunity to a suit challenging this. We think no because the discreteness requirement applies equally to both the nondiscretionary duty clause in Section 304A2 as well as the unreasonable delay clause, which I'll discuss in a minute. So that's our threshold position is that Congress has not waived sovereign immunity to that suit. Then if this Court is uncomfortable for whatever reason in holding that the duty is completely unenforceable under either of those provisions, if it is enforceable under any, it's clearly the unreasonable delay provision. And that's because as several circuits have held, the nondiscretionary duty clause, the sole clause under which the plaintiffs proceeded here, is limited to actions seeking to enforce a quote date certain deadline. Well, isn't the failure to conduct any reviews or reports an unreasonable delay in the end? Isn't that what this is about? Well, so I guess Your Honor is suggesting that an unreasonable delay claim could be brought. One has not been brought here and that ends the inquiry. I thought the claim was you haven't done any reports. That seems unreasonable and that seems to be the ultimate in delays. Well, I would say that, first of all, they haven't brought an unreasonable delay claim. But secondly, the question that Your Honor is articulating is, look, can you get the discreteness from the binary choice whether the agency failed or did the act? And the Supreme Court answered that question squarely in Norton where it said if you can't review, in other words, let's say that the plaintiff's allocation was EPA is doing this, but it's not doing it well enough. It's not doing it the way we want. That's clearly not an actionable claim under the Clean Air Act. But that's not this case. That's right. And what the Supreme Court said is it doesn't matter. You can't restructure the claim to say EPA has failed to do anything at all because the discreteness requirement comes from the definition of act in failure to act. And so you can't say that EPA has failed to perform a nondiscrete duty and use that as a way to get into court. The court said, no, you can't do that. You've got to find a waiver of sovereign immunity that is broader than that under the APA. And it's clear, and plaintiffs do not contest, that the waiver of sovereign immunity in the APA is coextensive with the waiver of sovereign immunity in Section 304A of the Clean Air Act. So if I'd like to get back, again, if the court is uncomfortable with the discreteness rationale, it can follow the date-certain-deadline rationale I just mentioned. Plaintiffs do not even bother to contend that Section 321A imposes a date-certain-deadline. It simply says conduct continuing evaluations without a date. So at a minimum, they would have had to bring an unreasonable delay claim. So the sole case that you're relying on for that requirement is the D.C. Circuit opinion? So it's the D.C. Circuit opinion. It's the First Circuit and Second Circuit's opinion that follow that. It's also, if you look at the structure of the Clean Air Act, what does the separate unreasonable delay provision mean, if not that when you have a mandatory duty to act but the statute is not clear as to a precise date when that action must occur, you bring an unreasonable delay claim with a 180-day notice provision, whereas when there is a deadline, the action, it's per se unreasonable for the agency to blow that deadline, and thus you bring a suit under Section 304A2. If this case falls anywhere, it falls in the unreasonable delay box, and it's quite clear they haven't brought that claim. I guess the policy behind your argument, perhaps in Congress, this would just be a messy situation. Absolutely. Absolutely. If you look at, you know, if it's literally a continuing duty, right, any day anybody come in and say, well, you haven't done, the administrator hasn't done it today, hasn't done it last week, hasn't done it last month, it's completely unadministrable, which is why, and the Supreme Court goes into this, it's the common law of judicial review of agency in action as codified in the Administrative Procedure Act and carried forward in the Clean Air Act that Congress has said, look, this is a question for the political branches, not that the duty is a dead letter, it's that it's not judicially enforceable because courts are ill-equipped to manage the data operations of agencies in this fashion, as the Supreme Court said in Norton and as this Court reiterated in Village of Bald Head Island. I'd like to turn now to a separate jurisdictional question, which is a constitutional one, whether the plaintiffs have articulated, whether they've established at the summary judgment stage, using specific facts, that they have standing to challenge EPA's alleged inaction under Section 321A. And they have not for several reasons. The principal argument that they make is that the informational injury is, that they've suffered Article III informational injury because Section 321A evaluations, if they were completed, and if the plaintiffs then filed a FOIA request and the agency were to respond to that request, then they'd be released. And as we've explained in our briefs in response to the Re28J letter. Hold on. Check on it. I don't even know where that noise is coming from. Can you speak over that? I'm happy to. As we've explained in our briefs in the recent 28J letter, the informational standing theory that plaintiffs articulate has never before been recognized and would essentially vitiate the Article III standing requirement with respect to agency inaction. With respect to economic injury, I think the thing to focus on. Let's talk about the informational standing question. So I didn't get from your brief that you disputed that if this information were ever created and a FOIA request entered, that that information would be produced. Is that fair? That's correct. But that's what Congress has said, and this is clear, or excuse me, what this Court has said in Salt Institute, is that absent a particular articulation by Congress in the statute of which that's the gravamen of the claim, that there's a public disclosure requirement, there's no Article III injury in fact merely by deprivation of information because that's not the sort of, unlike economic harm, for example, that's not the sort of injury that at common law was recognized as conferring Article III standing. To get to economic injury, I think the place to focus on is the regressibility and the absence of regressibility because ultimately it depends on the policy discretion of EPA and Congress as to how, if EPA is forced to do this, how it will affect affirmative EPA actions. And then I just want to briefly turn in the time I have remaining to remedy, which is that the district court clearly went beyond the scope of its authority, even assuming that it had jurisdiction and that EPA should be liable on the merits by imposing substantive requirements like requirements that EPA analyze undefined subpopulations, impacts on environmental justice, impacts on communities, et cetera, et cetera. None of that is in the statute. And finally, I would just say, if this court is inclined to rule for EPA on this, in this case, we would respectfully ask that it do so promptly given the burdensome injunction that the agency is currently facing. Let me ask you about that. Has that injunction been stayed? It has not been stayed, Your Honor. Have you requested a stay? We have not requested a stay. We asked for expedited review, and this court appreciated granted it. The first substantive deadline for compliance is July 1st. We're currently doing our level best to comply with that injunction, but obviously the sooner that the court can rule, the more we would appreciate it doing that. All right. Thank you, sir. Mr. DiPaolo. Thank you, Your Honor. My name is William DiPaolo. I represent three nongovernmental organizations based in West Virginia who are, I think, traditionally viewed as the beneficiaries of EPA regulations. That is, they're persons who have sought to avoid the adverse health and safety impact. That's the opposite problem. You're too close to the mic. You need to step back a little bit. Sorry. We'll get there. Very briefly, the question of our intervention and, if you will, the mootness of it hinge really around the fact that the election occurred in early November, very shortly after the October summary judgment was entered. There was a profound change in the regulatory horizon as a result of that election, and it became timely for us to intervene at that time. The fact that our focus was on the injunction only at that time was for the obvious reason that, at least in mid-December when we intervened, that was the only matter before the district court. That is, what is the remaining relief, if any, to be accorded to the plaintiffs. Let me ask you this. Let me start out by saying the argument is moot on appeal because any interest that Mon Valley had in the litigation has ceased. So what has not ceased? The ability to appeal the denial of an injunction. Their point is we haven't done it, and my answer is yet. Obviously, there is an ongoing proceeding before the district court. Between the October grant of summary judgment in favor of the plaintiffs and the December status conference, the court had an intervening proposal from the EPA. This is what we proposed to do, objections from the plaintiffs. That's not enough. The district court concurred with the plaintiffs. That ongoing procedure is what is now before us. We are not an anti-injunction society. We are here to deal with the adverse health effects of the coal industry. Coal generates 96% of the electricity in West Virginia. There is nowhere a West Virginian can run to get away from it. Those adverse health effects include increased birth defects, decreased birth weight, increased cardiopulmonary and cancer through life, a very substantially decreased life expectancy, very substantially decreased. So Murray Energy makes what I consider, frankly, a compelling argument about the importance of regulatory advocacy. We believe in regulatory advocacy. The posture we are in right now is that they have a court-sanctioned, and I use this word mutually, side door, if you will, to the EPA. That is, it's an ongoing operation. There is no scheduled end to their ability to participate in the EPA's formulation of policy. It's assessment, did we save too many lives at the expense of too many jobs? We have a right to be at that table on an ongoing basis, and that's the reason we're here today. Thank you, sir. Thank you. Thank you. Mr. Lazzaretti. Adjust this mic to a good height to start. Is that okay? Yes. Okay, great. Your Honors, and may it please the Court, my name is John Lazzaretti, counsel for plaintiffs below and appellees here with lead plaintiff, Murray Energy Corporation. Your Honors, I'd like to start by noting that this is a case in which after three years of litigation, the district court, Judge Bailey, issued not only a 64-page memorandum of opinion finding that EPA had failed to comply with a mandatory duty, but then issued a 28-page final order finding the U.S. Environmental Protection Agency was hostile to compliance, had refused to comply, and would not comply absent judicial intervention. The Court further found that EPA had the capability of complying, could do so promptly, and that compliance would benefit not only the general public, but plaintiffs in particular. There was no error in the Court's legal analysis or factual findings, therefore we're requesting that this Court affirm. There was a statement twice in its opinion that the EPA had a war on coal part of legal analysis. What is that? Your Honor, it would be a mixed. How does that fit into the legal analysis? There are two components to what the Court properly characterized as a war on coal. The first is the legal action that the agency was taken, but then is the factual findings as to what the consequences of those actions were and what the purpose of those actions was. So what the Court was referring to is what we've described as the utility strategy, and it's something that helps put this case into context. Are you saying that the District Court found, as a matter of fact, that the EPA has an ongoing war on coal? Well, Your Honor, the Court found, as a matter of fact, that the agency was engaged in a practice of reducing the consumption of coal and that the job story was important to that narrative for the agency and that, overall, the actions EPA has taken, both through administration and enforcement of the Clean Air Act, that's including the National Air Quality Standards, that's the Clean Power Plan, that's all of the rulemaking cited by the plaintiffs, that there was a significant impact on the consumption of coal, the availability of coal, and then a ramification in employment both in the coal sector and in communities dependent on coal. For example, in Dr. Deskin's expert report detailing the devastation of Boone County, West Virginia, including over a 65 percent reduction in coal employment and a 27 percent reduction in overall employment attributable to reductions in coal consumption from primarily coal-fired utilities. Would everybody in Boone County, West Virginia, have standing to bring the suit that you brought here against the EPA? Well, everyone in Boone County who is affected by those reductions in employment would be injured to some degree. The question of whether they meet all of the constitutional elements of standing is difficult to say without a concrete factual pattern. How does your client meet the elements of standing? Plaintiffs met the elements of standing based on a number of injuries that were suffered. The district court broke it down into three categories, informational injuries, economic injuries, and procedural injuries, all of which are independently appropriate for standing. To start with the issue of informational injury, because that's a very straightforward legal theory that's based on FEC v. Aikens, clearly the deprivation of information to which there's a statutory right is a legally cognizable injury for Article III standing. When you say statutory right, there's no express statutory right in the Clean Air Act for the information, so you have to derive that right from another statute. Correct, Your Honor, to the extent that there is a statutory mandate in the Clean Air Act to create the information to the extent that it's dependent on plaintiffs obtaining that information in order to use it, FOIA is one example of a way to get that. And our point in the 28J letter, well, one, looking at FEC v. Aikens itself, the Supreme Court never said it had to be the exact same statute, only it had to say that there has to be a statutory right to the information. Of course, that requires a component of, one, the information has to be created, and two, you have to have access to it. And our point there and what the district court found is that under the Clean Air Act, the information absolutely must be created, and as EPA has conceded here at oral argument, there is no way to bar plaintiffs' access to that information. But you don't have any case, and we certainly haven't been able to find any case, that sort of engages in this bootstrapping argument. You don't have an express right under one statute. You file a lawsuit to create the information, compel creation of the information, and then you use a completely different statute to compel its disclosure. We don't have a case like that. Well, Your Honor, the one case for that would be Water Keepers, which we cited in the 28J letter, where the information was required to be generated under CERCLA, but would only be available to the plaintiff under EPCRA. So that is an example, and both in FEC v. I mean, to unpack that just a little bit, in both FEC v. Aikens and in Water Keeper, the information was not already extant. This was information that had to then be submitted. So they were looking to trigger a process through which information would be generated. Here, the suit is directly to compel the agency to produce the information. So it is more direct than in both of those cases. And then the second step, once the information is created, how do we get access to it? Water Keeper is an example of using a separate statutory right to the information to get information that was required to be created under CERCLA. So in our context, we're simply using FOIA instead. You want to go back to the sovereign immunity issue, because that's what concerns me, and the question of what is a discrete function under the statute and whether or not you actually need to have a date certain in order to obtain any relief under the statute. Yes, Your Honor, and if I may address both of those in order, starting with the concept of discrete. We, too, are concerned because we do not concede anywhere in the brief that discrete is an independent requirement from nondiscretionary duty. What we acknowledged in the brief is that there is a line of cases, most notably the Southern Utah Alliance case with Justice Scalia's opinion in the Supreme Court, discussing the independent discrete requirement under the APA. So if this was an APA claim, there is a statutory definition of an agency action. Justice Scalia found that you had to be justum generis with the listed types of agency actions, and that required a concept of discreteness under the APA. Our position is that even if there is a discrete requirement under the Clean Air Act, we satisfy it. This is clearly a discrete mandatory duty, because discrete doesn't – it's not a mathematical concept of a continuing versus a discrete variable. What Justice Scalia was referring to was the type of discretionary management decisions that involve the court in the day-to-day operations of an agency. This is nothing like that. This is whether or not EPA has any type of 321 program at all, not are they doing it in the right way. So this is easily distinguishable from the challenge. Well, except for the fact that the scope of the injunction, the order itself, is fairly particular with respect to the requirements that the EPA is going to have to comply with. Well, it's – there are two components to the injunction. One is the fundamental component is by the end of the year, EPA has to take some action, not defined, to demonstrate that it is complying with 321 and will do so going forward. But, you know, on your disclosure argument, you look at 321A. Congress didn't create a disclosure requirement there, but they know how to do it because they did it in 321B. And so wouldn't we have to assume that Congress knew what it was doing to impose a disclosure provision in one section and not in another? Yes, Your Honor, there is an inference to be made, but it's not the inference that disclosure was not intent under 321A. On a pure textual basis? Sir? Just on a pure textual analysis of that? Yes, Your Honor, and the reason that you get textual distinction is basically the reason that that language is inserted elsewhere in the statute. So in other words, there are different ways to get information, one of which is to request through FOIA. So there's information that is created by the government, and then there's a question of do you have a right to it. From time to time, Congress can exempt things from that. They can require that information be published. They can require that it be made publicly available. And that's what's happening in 321B. There's other statutes that were cited where EPA – the process needs to be done under another judicial review provision that might – 7607 is referred to as the Clean Air Act section for judicial review of certain agency actions that require things to be done on a record. There's an entire procedure laid out. And so Congress does have to, from time to time, address different degrees of public availability. But that doesn't mean that when they don't make something publicly available without a FOIA request, that any time that they don't provide that right, that there's no right to public access. That's not the inference that can be made from Congress's decision not to include specific language in 321A, that the information must be made publicly available. If I may get back to the – starting with the concept of discrete. The first issue is that 304A2, so that's the Citizens' Subprovision of the Clean Air Act, is very straightforward. It allows for a suit for any act or duty that is not discretionary with the administrator. That's the only requirement in the statute. To the extent that there's – that encompasses the idea that the duty under review has to be – have sufficiently specific to be judicially cognizable and enforceable, there is that element. And Judge Bailey properly found that 321A is a specific statutory mandate. And so was judicially enforceable. And the court could determine relatively easily that EPA was not complying with it. We have EPA's own 30B6 testimony that it was not complying with this specific duty. To the extent that EPA now tries to come in and say, in addition to the idea of it having to be a discrete mandatory act, so a nondiscretionary duty, that there's some additional component of discreteness that we want to – there's no support for that. There's no support that Congress intended to restrict the right to bring suit under 304A2 beyond making it an act or duty that is not discretionary with the administrator. As a point of statutory interpretation on that, one difficulty EPA has with that assumption is they are trying to equate – under the EPA, the only reviewable thing is an agency action. And, of course, if it's not given a statutory right, it has to be a final agency action. But what EPA was saying up front is they're trying to equate the concept of act. The problem is 304A2 covers any act or duty. So what you end up with is duty becomes superfluous if act means action, and the only thing you can bring a citizen suit for is an agency action under the EPA. I still don't understand how your client has any direct injury, not through its customers, the power plants, or through its employees, but your client. The CAA regulations don't apply to you directly, do they? They apply to your customers, the power plant. There are some CAA regulations that apply to us directly. The one we're talking about. Well, I mean, what we're talking about – so 321A covers the administration and enforcement of the Clean Air Act in its entirety. So one of the issues that was raised at the district court was, yes, we are directly regulated by Clean Air Act administration and enforcement activities. We cite to the greenhouse gas reporting requirements that we have to comply with, all which EPA should have considered the job consequences of before they imposed these requirements. But by far, the greater injury, the more significant issue from an economic perspective, is the fact that EPA has had a concerted effort to regulate and to reduce the consumption of coal from coal-fired utilities who are our primary customers. I mean, that's our customer base. That's our market. And so one of the things that Judge Bailey correctly found, and one of the challenges that was raised below – Your customer base may have a direct injury, but you don't. With respect to the reduced market for coal, there is a causal chain in that EPA is affecting the demand for our product. We would submit that is a direct injury, much like in the ethyl cork. I'll go back to then. So arguably, where does it end? Based on your argument, everybody in the State of West Virginia could somehow be impacted. By what you say is the EPA's war on coal. So everybody could bring this lawsuit against the EPA. Based on your argument, sounds to me like, because everybody could be impacted in the same way you are, somehow economically. The coal miners in Boone County lose their jobs. Then businesses have to shut down because the coal miners can't spend money there. You know, it just goes on and on. How is your standing discreet at all or direct at all? I just don't – I'm not quite getting it. Well, certainly anyone could bring a claim if they can demonstrate they are suffering a concrete and particularized injury and fairly traceable. I'm trying to understand yours. As far as from the economic perspective, so setting aside informational and procedural standing, from an economic perspective, the injury is sufficiently concrete and particularized. I mean, certainly it's concrete. There is a well-documented in the record reduction in the market for coal. You have the deposition testimony, and then it is particularized to us. You have the deposition testimony of Murray Energy executives discussing the fact that recent purchases were not as profitable because of the destruction of the market for coal. You have the specific example of the mining operations in Brilliant, Ohio, where there was EPA restrictions on their ability to sell to their sole customer. That ultimately led to the early closure of that mine. And as a matter of fact, that mine has since been – or has since decided to re-fire, so it will no longer be burning coal in the future. How did you suffer informational injury? As far as – in the record – actually, EPA does a good job in the reply brief below page 10 of their reply brief of summarizing the record on informational injury. There were a number of, again, executives from plaintiffs who were discussing the value of the information to them both in employee relations, in informing their employees of the impacts that EPA's regulatory actions are having, in their ability to plan, in their ability to make financial decisions, and also in their regulatory advocacy and in their petitions to the government. Murray Energy and other plaintiffs are heavily involved in regulatory advocacy. Mike Cape, Vice President of Government Affairs, testified to the value that these evaluations would have in his ability to do his job effectively. There was also expert reports. Jeff Homestead discussed at length the value of this information in opposing regulations and in seeking to modify those regulations. It seems to me your FOIA request is in tension with our Turner case, which says something to the effect, FOA imposes limited duties on federal agencies. It does not obligate agencies to create or retain documents. It only obligates them to provide access to those which, in fact, the agency has created and retained. And it seems like your disclosure request is going beyond that. No, Your Honor, because the Clean Air Act requires that the information be created and then FOIA simply guarantees access to it, unless you fall within one of the exceptions, none of which have been asserted. But at what level of detail is this information required to be generated? I mean, the language is fairly broad, and the district court in this case seems to have imposed some rather specific requirements on the EPA. Yes, Your Honor, and getting back to the scope of the injunction and why that was reasonable, one, the primary piece of the injunction is a requirement that does not go into much detail at all, and that's to ensure that you are complying with the 321 program. It seems like the other component, that there has to be within six months an evaluation of those industries most vital to plaintiffs. The court went into more detail, but that was proper in this particular context because what happened was Judge Bailey first issued his memorandum of opinion granting summary judgment, finding EPA was not in compliance, then gave the United States 14 days to submit a proposal on how they would apply. Did not give any guidance to it. Asked, what is your proposal and schedule for compliance? They did not submit a proposal and schedule for compliance. They have not at any time in this case actually identified how they would comply or what the requirements of compliance are. They have left it entirely to Judge Bailey to have to figure that out on his own. Their only defense was here are 64 documents. Read them and figure out whether they meet whatever you think 321A is. With that level of recalcitrance in the face of a clear statutory duty, it was appropriate and, in fact, necessary for Judge Bailey to provide additional guidelines and additional signposting as injunction to make it adequately enforceable. He had to give them notice because they weren't telling him what they planned to do otherwise. So in that particular context, while there is more detail, it was necessary detail. And it is justified under the court's equitable authority to issue an order compelling compliance with a statutory mandate. Well, there are some, I guess, inherent limitations it seems to me when dealing with the government who at all times generally is presumed not to waive sovereign immunity. And I recognize the district court in this case found that there had been a waiver, but that would, it seems to me, would still counsel on trying to be as narrow and focused as one could be in issuing an injunction. And this seems to me to be a very broad order. Well, Your Honor, as far as the breadth of the order, I mean, it is clearly aimed toward requiring EPA to comply with the statutory mandate and doesn't go beyond that. As far as what information was necessary to ensure that EPA was going to comply, the order does not provide a lot of detail on general compliance. There is more detail as far as what to do in the coal industry on an initial study, which has a remedial component as well because of the injuries we are suffering. To the extent that the court, you know, to the extent there is an objection that, well, you know, he is requiring us to look at environmental justice. He is requiring us to look at what the families of the communities are being exposed to. That was all well supported in the congressional record and the statutory text and context as far as what 321A was about. So we had a fundamental dispute here, and this is getting, I am sorry, Your Honor. Thank you. On this issue of can we just call everything a timeliness issue, the problem is there is a fundamental dispute not when EPA should be doing this, but what EPA should be doing. EPA changed its interpretation midstream. We had a disagreement with them as to what the fundamental concept of the 321A study was. In that particular context, the district court did need to provide a definition, provide some context for the agency as to what it intended to be compliant so that they could comply with the court's order. Thank you very much. Thank you, Your Honor. Thank you, Your Honor. I would like to start with the discrete versus continuous point. There was a suggestion by my friend, Mr. Lazzaretti, that there is a difference potentially between the APA and the Clean Air Act in terms of discreteness. I direct the court to page 53 of the response brief, in which the plaintiffs themselves argue that sovereign immunity was waived under section 702 of the APA, which itself in the first sentence makes clear that it only applies to, quote, agency action, exactly as the Supreme Court defined it in Norton versus Southern Utah Wilderness Alliance as a discrete action. The other place to look for that is in Senate Report 101-228, as we've cited in our brief, where it says, this is meant to cover everything that the APA covers, and given the strict construction that must be given sovereign immunity waivers, it has to be, this court should not read it more broadly than the Supreme Court has read action under the APA. So the easiest way, again, for this court to resolve the case is simply to say the discrete and continuous are opposites. They are not the same thing. The Supreme Court said a duty to shall continue to act is not enforceable by an argument saying that an agency has failed to do so. The same holds here. In terms of a date certain requirement, again, this court, there's no reason to create a circuit split by holding that the date certain deadline requirement does not apply under the Clean Air Act. In terms of standing, on informational standing, Judge Floyd's citation of this court's precedent on FOIA is opposite, and that stems from the Supreme Court's decision in Kissinger versus Reporters Committee on Freedom of the Press. It would be passing strange if under FOIA you couldn't get an agency to create new information, and yet under the Clean Air Act, you could get yourself into court to ask the agency to create information that is not, or excuse me, to create and publish information that is not required to be published by the statute itself. As far as the Waterkeeper case, we've pointed out in our response to the 28-J letter why that case is distinguishable. I'd also point to the D.C. Circuit's decision in Friends of Animals versus Jewell, cited in page 39 of our brief, where the D.C. Circuit makes clear that there's a difference between a requirement that an agency act and a requirement that an agency publish its decision, and only when there's the publication requirement at issue and the information already exists is it appropriate to use the informational standing theory. And as far as economic harm, as Judge Thacker was referring to, the theory of plaintiffs is quite expansive. There are no specific facts. The conclusory allegations in the testimony by the plaintiffs' employees and executives doesn't meet the standard of specific facts that the Supreme Court has laid out. But the bigger problem actually is redressability, which is they're basically arguing that hypothetically, if EPA did this action, it would hypothetically prompt new action, the EPA, to take other action, even though it can't under Section 321D affirmatively modify an existing or proposed requirement under the Clean Air Act based on Section 321A. And the other thing is, you know, as far as the legislation, that's obviously speculative. No court has recognized that the prospect of legislation is sufficient to confer standing. And finally, on remedy, I again point out that even if you assume that there's jurisdiction in this case and even if you assume that there's liability, which there's not because EPA has, in fact, evaluated potential job losses and shifts as required by Section 321A, Section 321A has no requirement as to specificity that it be done on a plant-by-plant basis. That, in fact, is explicitly discretionary in the second clause of Section 321A. And then as far as remedy, the court clearly exceeded whatever authority it possibly had under Section 304A2 of the Clean Air Act by prescribing a burdensome injunction that requires the agency to go through and analyze hundreds, if not thousands, of plants within a short period of time, even though the agency has explained to the court repeatedly why it did not have the necessary economic and informational tools necessary to do that on such a prompt schedule. So again... I understood Mr. Lazzaretti's response to that to be that once the district court entered summary judgment against the agency, you all just decided to pack up your marbles and go home and not cooperate. That's not accurate, Your Honor. If you look at our response, it explains that the agency needs to use the tools that it has available, and it would be irresponsible if the agency is not able to be able to put its imprimatur on a decision, on a document that says this or that plant is threatened. It would be irresponsible for it to do that without the necessary information. And so it needed sufficient time to gather that information. I see my time has expired. Do you have anything more to say about that? No. Again, I would just point the court to the clear precedent on the scope of remedy and then ask again that the court, if it is inclined to rule in our favor on any of these grounds, that it issue an order promptly in order to relieve the agency of its current obligations. All right. Thank you very much. Thank you. Do you have anything more you want to say, Mr. Paolo? No. I would like to focus on the microphone, but I want to address just briefly the topic of the ongoing study and the question Judge Stacker raised about the relevance of the war on coal language of the district court. The bottom line of it is it's very straightforward. And on page 11 of our reply brief, we have provided perhaps an atypical advocacy tool, a graph, which demonstrates concretely that environmentalists, whether in the government or outside, are not the agents of change that have adversely affected the coal industry. The natural gas industry, the Marcellus Shell, in which West Virginia happens entirely to fall, it's the only state in the country that falls entirely within the Marcellus Shell. The price of gas has dramatically dropped. For the first time in history, gas has supplanted coal as the fuel of choice of the electric generation industry. That's what's happened here. And the job shifts that have occurred have been not only to natural gas, but they've gone to solar, which now employs twice as many individuals as the coal mining industry in total, and it includes former coal miners who are being retrained to install solar panels on rooftops. Thank you very much.
judges: Albert Diaz, Henry F. Floyd, Stephanie D. Thacker